**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| TIFFANY RATLIFF, | CASE NO. 1:23-CV-00002 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Tiffany Ratliff ("Plaintiff" or "Ms. Ratliff") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 8.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I.     Procedural History

On January 19, 2017, Ms. Ratliff filed an application for SSI, alleging a disability onset date of November 1, 2005. (Tr. 81, 249-54, 1395.) She alleged disability due to depression and anxiety, bipolar disorder, panic disorder with agoraphobia, post-traumatic stress disorder, borderline personality disorder, obesity, knee pain, back pain, high blood pressure, diabetes, and migraines. (Tr. 132-33, 151, 171, 177, 277.) Ms. Ratliff's applications were denied at the initial level (Tr. 170-73) and upon reconsideration (Tr. 177-79), and she requested a hearing (Tr. 181-83). On October 2, 2018, a hearing was held, but it was postposed to allow Ms. Ratliff the

1

opportunity to secure representation.  (Tr. 95-100.)  The hearing was thereafter conducted on February 5, 2019.  (Tr. 101-27.)

On April 11, 2019, an Administrative Law Judge ("ALJ") issued a decision finding Ms. Ratliff had not been under a disability within the meaning of the Social Security Act ("2019 Decision").  (Tr. 78-94.)  On April 10, 2020, the Appeals Council denied Ms. Ratliff's request for review of the 2019 Decision.  (Tr. 1-7.)  Ms. Ratliff appealed to the U.S. District Court (Tr. 1482-95), and the case was remanded on April 2, 2021, pursuant to a joint motion to remand (Tr. 1499).  The Appeals Council issued its remand order on May 11, 2021.  (Tr. 1500-03.)

After a telephonic hearing on September 24, 2021 (Tr. 1426-57), another ALJ issued an unfavorable decision on November 2, 2021, finding Ms. Ratliff had not been under a disability within the meaning of the Social Security Act since January 19, 2017, the date the application was filed (Tr. 1391-1425).  Ms. Ratliff sought review of the ALJ's decision and filed a List of Exceptions to the decision.  (Tr. 1557-59, 1610-16.)  On November 1, 2022, the Appeals Council found no reason to assume jurisdiction, making the ALJ's November 2, 2021 decision the final decision of the Commissioner.  (Tr. 1384-90.)

On January 3, 2023, Ms. Ratliff filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 10 & 12.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Ratliff was born in 1980.  (Tr. 1416.)  She was thirty-six years old on the date the application was filed.  (*Id*.)  She lived with her mother.  (Tr. 106, 1436.)  She attended college but did not graduate.  (Tr. 105, 278, 1438.)  She had not worked in a full-time position since at least 2006.  (Tr. 277, 1438.)

**B.**     **Medical Evidence**

**1.**     **Relevant Treatment History**

**i.**     **Mental Health Impairments**

On November 4, 2015, prior to the application filing date, Ms. Ratliff underwent an adult diagnostic assessment with Chelsea Peticca, LPCC, at the Center for Effective Living.  (Tr. 388-400.)  LPCC Peticca recommended individual counseling and psychiatric services – medication management.  (Tr. 399.)  Ms. Ratliff attended therapy sessions with LPCC Peticca (Tr. 365-87) and psychiatric medication management appointments (Tr. 359-64) beginning in February 2016.

On January 7, 2017, Ms. Ratliff attended medication management with Steve Miller, D.O., with noted diagnoses of depression and "panic."  (Tr. 359.)  On examination, she was fully oriented and her affect, mood, insight, and judgment were good, but her panic and anxiety had increased.  (*Id*.)  Her medications included Lamictal, Pristiq, and Prozac.  (*Id*.)  Dr. Miller continued her medications, with an increase in her Lamictal dosage.  (*Id*.)

At a therapy session with LPCC Peticca on January 9, 2017, Ms. Ratliff presented with a low mood and congruent affect.  (Tr. 367.)  She reported financial and healthcare worries.  (*Id*.)  She was tearful and had little hope due to fears that she would lose her healthcare.  (*Id*.)  At her next therapy session, on January 24, 2017, she presented with a pleasant mood and appropriate affect, but continued to report financial stressors and worry over healthcare changes.  (Tr. 366.)  She said that worrying was making her sick; she had been vomiting and having migraines.  (*Id*.)  She cancelled her next therapy appointment, on February 6, 2017 (Tr. 1339), but presented with "appropriate range mood/affect" when she returned on February 27, 2017 (Tr. 1338).

Ms. Ratliff returned to medication management with Dr. Miller on March 11, 2017.  (Tr. 1342.)  She was friendly and cooperative with a "fair to sad" mood.  (*Id*.)  Her affect, insight,

judgment, and reality testing were good. (*Id*.) Her diagnoses were depression and anxiety / panic. (*Id*.) Dr. Miller increased her Lamictal and Prozac, and continued her Pristiq. (*Id*.)

Ms. Ratliff rescheduled her March 13, 2017 therapy appointment (Tr. 1337), and returned to therapy with LPCC Peticca on March 27, 2017 (Tr. 1336). She presented with a low mood and constricted affect, but was receptive and engaged. (*Id*.) She returned to therapy on April 20, 2017, presenting again with a low mood and constricted affect. (Tr. 1335.)

Ms. Ratliff returned to Dr. Miller on May 4, 2017. (Tr. 1341.) She was friendly and cooperative, but her mood was sad and her affect was constricted. (*Id*.) Her insight, judgment, and reality testing were good. (*Id*.) Her listed diagnoses were major depression, severe and recurrent, and dysthymia. (*Id*.) Dr. Miller added Abilify, increased Prasozin, and continued Pristiq and Lamictal. (*Id*.)

Ms. Ratliff returned to LPCC Peticca on May 8, 2017, presenting with a pleasant mood and appropriate affect. (Tr. 1334.) She reported familial stressors, and they discussed ways to manage those stressors. (*Id*.) She was receptive and well engaged during the session. (*Id*.) She cancelled her May 23, 2017 appointment (Tr. 1333), but presented with a pleasant mood and appropriate affect when she returned to therapy on June 1, 2017 (Tr. 1332). She expressed disappointment over learning that she was denied SSI, but they worked on reframing her perspective and remembering that tomorrow was a new day. (*Id*.) She was engaged throughout the session. (*Id*.) She returned to therapy on June 21, 2017, presenting with a pleasant mood and engaging well during the session. (Tr. 1331.) She expressed interest in getting back into writing poetry and shared a poem; she and LPCC Peticca processed the underlying meaning and emotions behind the poem. (*Id*.) At her next therapy session on July 6, 2017, she presented with a depressed mood and flat affect. (Tr. 1330.) She reported increased pain and difficulty getting

around because her weight had increased due to her medications.  (*Id*.)  They worked on processing her feelings of shame regarding her weight and dealing with hurtful comments made by other when she was in public.  (*Id*.)  Ms. Ratliff was receptive during the session.  (*Id*.)

Ms. Ratliff returned to medication management with Dr. Miller on July 8, 2017.  (Tr. 1340.)  She was friendly and cooperative with good insight, judgment, and reality testing, but her mood was sad, and her affect was constricted.  (*Id*.)  Her listed diagnosis was major depressive disorder.  (*Id*.)  Dr. Miller adjusted some of Ms. Ratliff's medications, discontinuing Abilify, decreasing Prazosin, starting Buspar, and continuing Pristiq and Lamictal.  (*Id*.)

The record does not include mental health treatment records from the remainder of 2017 or 2018.  The next medication management appointment in the record is an office visit with Dr. Miller on February 16, 2019.  (Tr. 1916.)  Ms. Ratliff's diagnosis was bipolar – depressed, and her medications included Pristiq, Latuda, and Lamotrigine.  (*Id.*)  On examination, she was fully oriented, less depressed, and more energetic; her affect and insight were fair, her reality testing was good, and she was future oriented.  (*Id.*)  Dr. Miller decreased her Lamotrigine dosage.  (*Id.*)

She returned to medication management on May 10, 2019, seeing an advanced practice nurse ("APN") instead of Dr. Miller.[1]  (Tr. 1915.)  She reported high anxiety and trouble falling asleep and staying asleep.  (*Id.*)  Her provider increased her Lamictal and Latuda dosage and started Remeron.  (*Id.*)  She returned to the same provider a month later, on June 7, 2019, reporting high anxiety and depression and racing thoughts.  (Tr. 1914.)  Remeron was discontinued, as Ms. Ratliff had already stopped taking it, and Paxil was added.  (*Id.*)

Ms. Ratliff attended a therapy session with Kate Boyan, LPC, on July 23, 2019.  (Tr. 1890.)  She reported better sleep since changing medications.  (*Id.*)  She was well groomed,

---

[1] The signature of the provider is hand-written and not legible, but the designation "APN" is legible.

cooperative, and calm, with clear speech, logical thoughts, and euthymic affect.  (*Id.*)  She described and processed a "dramatic" fight with her neighbor.  (*Id.*)

Ms. Ratliff returned to medication management on July 27, 2019, reporting continued symptoms of high depression and anxiety, but also that she was falling asleep better.  (Tr. 1912.) She thought Paxil was helping a little, as she was sleeping better, but she also thought her increased symptoms related to running out of Latuda and taking leftover medications.  (*Id.*)  Her Paxil dosage was increased, and Latuda, Lamictal, and Pristiq were continued.  (*Id.*)

At her next therapy session, on August 20, 2019, Ms. Ratliff reported that she was feeling okay but was not sleeping well.  (Tr. 1889.)  Paxil was not helping; a recent dosage increase "threw it off."  (*Id.*)  She continued to be well groomed, cooperative, and calm, with clear speech, logical thoughts, and euthymic affect.  (*Id.*)  She returned to medication management on September 7, 2019, reporting that the Paxil increase had thrown off her sleep schedule.  (Tr. 1910.)  She reported high depression, moderate anxiety, and poor sleep.  (*Id.*)  Her mood was depressed and anxious and her affect was constricted.  (*Id.*)  Her provider increased Latuda and started Melatonin.  (*Id.*)  Ms. Ratliff returned to therapy with LPC Boylan on September 19, 2019, reporting that she had started getting migraines since staring Latuda.  (Tr. 1888.)  Her examination findings remained unremarkable, the same as her August therapy session.  (*Id.*)  She reported another dispute involving her mother and her neighbor.  (*Id.*)

The record does not include further mental health treatment records for 2019.  Ms. Ratliff next returned to therapy with LPC Boylan on March 11, 2020, reporting that she had come off Latuda and was experiencing increased depression.  (Tr. 1887.)  She remained cooperative and calm, with clear speech, logical thoughts, and euthymic affect, and reported continued disputes with her neighbor, an increase in rent, and looking into new housing.  (*Id.*)  At her next therapy

session, on June 24, 2020, Ms. Ratliff reported that a mistake by the pharmacy meant that she had not had Paxil, Prestiq, Lamictal, and one other medication; she said she was "going to be out of meds in 10." (Tr. 1879.)  She was cooperative with clear speech and logical thoughts.  (*Id.*)

Ms. Ratliff's next medication management appointment was held via telephone on June 26, 2020.  (Tr. 1908.)  Her diagnoses included bipolar and PTSD, and her medications were Vistaril, Pristiq, Paxil, and Lamictal.  (*Id.*)  She complained of depression due to the Covid-19 pandemic and presented with a blunt affect and fair mood.  (*Id.*)  She attended telephonic therapy sessions with LPC Boylan on July 15 and August 24, 2020. (Tr. 1884, 1885.)  In both sessions, she was cooperative and calm, with clear speech and logical thoughts, but her affect was depressed in the July session.  (*Id.*)  In July, she complained of being on a "downward" trajectory, feeling down about turning 40.  (Tr. 1885.)  In August, they discussed writing workshops and art therapy.  (Tr. 1884.)

Ms. Ratliff next attended medication management on September 18, 2020, where she complained of increased depression (7/10), worries about dying, and increased irritability, but reported no anxiety (0/10).  (Tr. 1906.)  Paxil was increased, and her other medications were continued.  (*Id.*)  She returned on October 2, 2020, having complained of a rash since the increase in her Paxil dosage.  (Tr. 1904, 1905.)  Paxil was discontinued.  (Tr. 1905.)

She attended telephonic therapy sessions with LPC Boylan on September 28 and October 14 and 26, 2020.  (Tr. 1881, 1882, 1883.)  She continued to present as cooperative with clear speech and logical thoughts.  (*Id.*)  In September, she complained about increased distress due to the political climate.  (Tr. 1883.)  On October 14, she reported stopping one medication due to side-effects, and that her mood was "so / so" and "up + down" since stopping that medication. (Tr. 1882.)  She had stopped paying attention to politics.  (*Id.*)  On October 26, she reported

substantially increased anxiety and worrying "about the state of the world."  (Tr. 1881.)  She was also dealing with "copious amounts" of doctors' appointments with limited transportation.  (*Id.*)

Ms. Ratliff attended a medical evaluation for medication management with a certified nurse practitioner ("CNP") on November 13, 2020.[2]  (Tr. 1902.)  She complained of depression at a level of 10/10, saying she had been feeling down since being off Paxil.  (*Id.*)  Her anxiety was 7 to 7.5 out of 10.  (*Id.*)  She presented with a blunt affect and fair mood.  (*Id.*)  Her provider added Cymbalta and continued Lamictal, Vistaril, and Pristiq.  (*Id.*)  She returned for a telephonic medication management visit with the same provider on December 11, 2020, presenting with a blunt affect and fair mood.  (Tr. 1901.)  She reported moods that were up and down, but a little more depressed since being off Paxil; she rated her level of depression as 7.5 to 8 out of 10.  (*Id.*)  She complained of jerky movements with Cymbalta.  (*Id.*)  Her provider discontinued Cymbalta, started gabapentin, and continued her other medications.  (*Id.*)

She attended a telephonic therapy session with LPC Boylan on December 8, 2020, presenting as cooperative with clear speech and logical thoughts.  (Tr. 1880.)  She complained of pain and neuropathy, worry about getting to her appointments, worry about the state of the country, and isolation.  (*Id.*)  She next attended a telephonic medication management session on January 8, 2021, presenting with a blunt affect and good mood.  (Tr. 1900.)  She reported that gabapentin was not helping her anxiety or sleep, and that her foot pain had returned since she discontinued Cymbalta. (*Id.*)  She complained of anxiety at 4/10 and depression at 8/10.  (*Id.*)  Her provider increased her gabapentin dosage.  (*Id.*)  She attended a telephonic therapy session on the same day, presenting as cooperative, with clear speech and logical thoughts.  (Tr. 1878.)  She reported increased anxiety regarding the state of politics and medical concerns.  (*Id.*)

---

[2] The signature of the provider is hand-written and not legible, but the designation "CNP" is legible.

8

Ms. Ratliff attended telephonic medication management sessions on February 1 and 19, and March 1 and 15, 2021. (Tr. 1895, 1897, 1898, 1899.) On February 1, she reported that her mother had been admitted to the hospital and then assisted living; she felt overwhelmed and unable to take care of her mother. (Tr. 1899.) At Ms. Ratliff's request, her provider discontinued gabapentin and resumed Cymbalta. (*Id.*) Her provider also added Cogentin and continued Vistaril, Pristiq, and Lamictal. (*Id.*) On February 19, Ms. Ratliff reported shoulder pain from a recent fall, and that her mother was back home from the assisted living. (Tr. 1898.) On March 1, Ms. Ratliff reported another fall, and complained of gastrointestinal problems and diabetic neuropathy. (Tr. 1897.) She was tolerating Cogentin well and had not had any tremors or restlessness. (*Id.*) Her stressors included caring for her mother after she suffered a recent stroke. (*Id.*) Her provider continued her on Lamictal, Cogentin, Vistaril, and Pristiq. (*Id.*) On March 15, Ms. Ratliff's affect was fair but she complained of being tired since the daylight savings time change; she denied hallucinations, paranoia, or racing thoughts. (Tr. 1895.)

Ms. Ratliff attended a telephonic therapy session with LPC Boylan the next day, on March 16, 2021, complaining of anxiety and depression. (Tr. 1877.) She was cooperative with clear speech and logical thoughts. (*Id.*) She reported that she was not feeling well, was struggling to make ends meet, and was worrying about caring for her mother. (*Id.*)

She next attended a telephonic medication management session on July 12, 2021, presenting with a blunt affect and fair mood. (Tr. 1894.) She complained of medical and mental issues, including diabetic neuropathy and allergies, and said she was sleeping too much. (*Id.*) She rarely had tremors and denied medication side effects. (*Id.*) She continued on Cogentin, Cymbalta, Vistaril, Lamictal, and Pristiq. (*Id.*) She attended a telephonic therapy session with LPC Boylan a few days later, on July 15, 2021, presenting as cooperative with clear speech and

logical thoughts.  (Tr. 1876.)  She was worried about her health and feeling socially isolated, reporting that pain reduced her ability to get out.  (*Id.*)  She was also preparing for her social security disability hearing.  (*Id.*)

### ii.     Physical Impairments

The record reflects treatment for various physical impairments prior to the application filing date, including treatment for joint pain, diabetes, hypertension, migraines, heavy menstrual periods, and thyroid problems.  (Tr. 403, 416, 421.)

In March 2017, Plaintiff underwent a brain CT for intractable migraine without aura.  (Tr. 585.)  The scan showed a calcified subcutaneous lesion along the right temporal region nodule, but no evidence of an acute intracranial process.  (Tr. 585-86.)  A dermatology work up was advised for the lesion.  (*Id.*)

On June 28, 2017, Ms. Ratliff presented to her primary care provider Neil Smith, M.D., for diffuse joint pain, particularly in the wrists, ankle, and knees.  (Tr. 610.)  She also complained of hand twitching bilaterally several times a day.  (*Id.*)  Her diabetes and hypertension were poorly controlled and it was noted that a thyroid ultrasound showed thyroid nodules, which required a follow up with endocrinology.  (*Id.*)  Physical examination findings were unremarkable.  (*Id.*)

Over a year later, on July 24, 2018, Ms. Ratliff presented to neurologist Samer Saleh, M.D., (Tr. 622-27), for muscle spasms in her hands and feet that had been occurring on a daily basis since 2017 (Tr. 622).  She also reported that she had dizziness and migraine headaches. (Tr. 623.)  Objective examination findings were normal, with intact strength and sensation and a normal gait.  (Tr. 624-25.)  Dr. Saleh recommended an EEG to look for "any fragments of

epilepsy," but also indicated the spasms could be a side effect of the Buspar she was taking; she was advised to wean off the medication.  (Tr. 626-27.)

On August 30, 2018, Ms. Ratliff saw Dr. Smith for follow up on her hypertension and diabetes.  (Tr. 621.)  Physical examination findings remained unremarkable.  (*Id*.)  Her diabetes was "under good control," and at home blood pressure readings were recommended.  (*Id*.)

Ms. Ratliff presented to endocrinologist Judy Jin, M.D., for evaluation of thyroid nodules in February 2019 (Tr. 1649), and had her thyroid removed due to multinodular goiter on March 1, 2019 (Tr. 1631-33, 1649).  The surgical pathology found that the thyroid had been cancerous.  (Tr. 1668-70.)  She followed up with Alexandra Mikhael, M.D., for a treatment plan following her cancer diagnosis.  (Tr. 1663-72.)  Dr. Mikhael increased Ms. Ratliff's dosage of levothyroxine and recommended repeat blood work with follow up in three months.  (Tr. 1671.)

Ms. Ratliff returned to Dr. Smith for follow up regarding her diabetes on July 16, 2019.  (Tr. 1871.)  Her examination findings were unremarkable, but her diabetes was poor controlled.  (*Id*.)  Dr. Smith increased her Metformin.  (*Id*.)  In October 2019, Dr. Mikhael advised Ms. Ratliff that her thyroid cancer marker (thyroglobulin) was lower, which was good news; therefore, she indicated Ms. Ratliff could continue to hold off on radioactive iodine.  (Tr. 1739.)

On April 2, 2020, Ms. Ratliff saw Dr. Mikhael for a distance health visit for follow up regarding her thyroid cancer and diabetes.  (Tr. 1756-62.)  She was happy, smiling, and interactive, and was moving all extremities.  (Tr. 1757.)  Dr. Mikhael noted that her diabetes was uncontrolled and indicated that she might have neuropathy.  (Tr. 1761.)  He increased her levothyroxine, continued her prescriptions for Metformin and Jardiance, and started her on Victoza injections.  (Tr. 1762.)

11

On November 2, 2020, Ms. Ratliff had an ultrasound of her kidney due to an abnormal renal lesion.  (Tr. 1703-04.)  The impression was hyperechoic focus in the right upper renal pole likely representing an angiomyolipoma and a left adnexal cystic lesion.  (Tr. 1704.)

On December 3, 2020, Ms. Ratliff presented to neurologist Rebecca Kuenzler, M.D., regarding concern for neuropathy in her feet and hands.  (Tr. 1781.)  She reported that her symptoms had started as numbness in her big toes in early 2020 and spread to the rest of her feet with tingling, numbness, and shooting pains.  (*Id*.)  She also reported that she started to have numbness in her hands in November 2020.  (*Id*.)  She reported some problems with her gait, indicating that she walked on the outside of her feet and had done so for about ten years.  (*Id*.)  She also reported two falls in 2020 due to tripping or stumbling over her own feet or other objects.  (*Id*.)  She reported daily headaches, with more severe migraines once or twice a week.  (*Id*.)  On examination, she had no peripheral edema, normal range of motion, mild lumbar paraspinal tenderness, normal tone and strength, and intact gait, but decreased sensation in her hands and feet and diminished reflexes in the triceps and left ankle.  (Tr. 1782-83.)  Dr. Kuenzler found the examination was "compatible with distal small fiber neuropathy with note made of ankle reflex asymmetry and mild distal sensory asymmetry."  (Tr. 1784.)  Dr. Kuenzler recommended a skin biopsy, lab work, physical therapy for low back pain and gait imbalance, topical lidocaine, and a home sleep test for sleep apnea.  (*Id*.)

 A skin biopsy taken in December 2020 was consistent with moderate small fiber sensory neuropathy.  (Tr. 1791-92, 1805.)  Ms. Ratliff's home sleep test confirmed a diagnosis of at least mild obstructive sleep apnea.  (Tr. 1793-96.)

At an ophthalmology appointment on January 15, 2021, it was noted that Ms. Ratliff had experienced "[m]uch better glycemic control over the last year since starting Victoza" (Tr. 1808,

1811).  On January 25, 2021, Dr. Jin noted that Ms. Ratliff was two years out from her original thyroid cancer diagnosis and doing well with no evidence of disease recurrence.  (Tr. 1815.)

On February 7, 2021, Ms. Ratliff presented to the emergency room after slipping on the ice and hurting her shoulder four days earlier.  (Tr. 1707.)  She reported pain in her left upper back above the shoulder, and increased pain with movement.  (*Id*.)  She demonstrated diffuse tenderness in the left shoulder, full range of motion in the shoulder with slight discomfort, increased pain with extension above 90 degrees, and mild pain with external rotation.  (Tr. 1710.)  Her sensation was intact over the axillary nerve.  (*Id*.)  She had no gross deformity, no tenderness to the clavicle and scapula, and no midline or paraspinal tenderness in the cervical, thoracic, or lumbar spine, but she had mild tenderness in the left trapezius muscle.  (*Id*.)  She had normal grip and normal strength in the biceps and triceps bilaterally.  (*Id*.)  Her sensation was grossly intact and symmetric bilaterally, with no focal motor deficits, and she was ambulatory with a steady gait.  (*Id*.)  X-rays showed mild AC joint degenerative changes, but no acute fracture or dislocation; the glenohumeral joint space was well-maintained.  (Tr. 1705, 1711.)  She was diagnosed with shoulder strain and given Tylenol and Lidoderm patches.  (Tr. 1711.)

At an endocrinology follow up for her diabetes and thyroid cancer on February 26, 2021, she reported she was walking less after falling on the ice and injuring her shoulder and arm.  (Tr. 1829.)  She reported that her energy was low, and her sleep was inconsistent.  (Tr. 1830.)  Her blood sugar was improved and controlled.  (Tr. 1834-35.)  Her blood pressure was also well controlled.  (Tr. 1835.)  Her levothyroxine dosage was decreased.  (*Id*.)

On June 15, 2021, Ms. Ratliff had a virtual appointment with Dr. Smith, complaining of worsening neuropathy.  (Tr. 1872-73.)  Dr. Smith recommended blood work and further evaluation of peripheral neuropathy was needed.  (Tr. 1873.)

2. **Opinion Evidence**

    i. **Treating Sources**

*2017 LPCC Peticca*

On July 20, 2017, Chelsea Peticca, LPCC, at the Center for Effective Living completed a questionnaire regarding Ms. Ratliff's mental health conditions.  (Tr. 1326-28.)  LPCC Peticca indicated she first saw Ms. Ratliff in November 2015 and last saw her in July 2017.  (Tr. 1326.)  Ms. Ratliff's diagnoses were PTSD, panic disorder with agoraphobia, unspecified bipolar disorder, and borderline personality disorder.  (Tr. 1328.)

LPCC Peticca opined that Ms. Ratliff had no intellectual limitations, but she struggled focusing at times and her pace and concentration were impacted by her symptoms of anxiety and depression.  (Tr. 1327.)  She indicated that Ms. Ratliff had difficulty being in public, which prevented daily functioning, and she often isolated as a result of her mental health symptoms.  (*Id.*)  She indicated that Ms. Ratliff became highly anxious in large crowds.  (*Id.*)  She opined that Ms. Ratliff's symptoms were severe and ongoing and had persisted throughout treatment.  (*Id.*)  Although there had been some progress and relief in symptoms with medication, she indicated that Ms. Ratliff's symptoms were still severe.  (Tr. 1328.)  She opined that Ms. Ratliff exhibited low stress tolerance as to daily and ongoing stressors and would have "difficulty tolerating work place stress due to symptoms of anxiety, depression, [and] PTSD, [and] instability in moods."  (*Id.*)

*2018 LPCC Peticca and Dr. Miller*

In the fall of 2018, LPCC Peticca and Steven Miller, D.O.,[3] completed a check-box style Medical Source Statement – Mental Capacity form.  (Tr. 902-03.)  They indicated that Ms.

---

[3] LPCC Pettica signed the form on in October 2018 and Dr. Miller signed the form in November 2018.  (Tr. 903.)

Ratliff had been under their care since November 2015.  (Tr. 903.)  They rated Ms. Ratliff's functional limitations in four categories: Understand, Remember, or Apply Information; Interact with Others; Concentrate, Persist, or Maintain Pace; and Adapt or Manage Oneself.  (Tr. 902-03.)  The available rating choices were: none, mild, moderate, marked, or extreme.  (*Id.*)

They opined that Ms. Ratliff had *mild* limitations in the following areas: change activities or work settings without being disruptive; work close to or with others without interrupting or distracting them; and be aware of normal hazards and take appropriate precautions.  (*Id.*)

They opined that Ms. Ratliff had *moderate* limitations in the following areas: describe work activity to someone else; recognize a mistake and correct it; sequence a limited amount of multi-step activities; use reason and judgment to make work related decisions; ask for help when needed; initiate and perform a task that she understands and knows how to do; distinguish between acceptable and unacceptable work performance; and maintain personal hygiene and attire appropriate to a work setting.  (*Id.*)

They opined that Ms. Ratliff had *marked* limitations in the following areas: understand and learn terms, instructions or procedures; follow one or two step oral instructions to carry out a task; ask and answer questions and provide explanations; cooperate with others; state own point of view; understand and respond to social cues; work at an appropriate and consistent pace; respond to demands; set realistic goals; and make plans for oneself independent of others.  (*Id.*)

They opined that Ms. Ratliff had *extreme* limitations in the following areas: identify and solve problems; handle conflicts with others; initiate or sustain conversation; respond to requests, suggestions, criticism, correction and challenges; keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; ignore or avoid distractions while working; sustain an ordinary routine and regular attendance at work; work a full day without

needing more than the allotted number or length of rest periods during the day; adapt to changes; and manage one's psychologically based symptoms.  (*Id*.)

When asked to identify Ms. Ratliff's diagnoses and medical and clinical findings that supported their assessment, LPCC Peticca and Dr. Miller, identified the following diagnoses: PTSD, panic disorder with agoraphobia, unspecified bipolar disorder, and borderline personality disorder, noting that Ms. Ratliff had a long history of mental illness since adolescence.  (Tr. 903.)  They stated that treatment would be ongoing due to the intensity and duration of symptoms.  (*Id*.)  They indicated that Ms. Ratliff presented as lethargic, with a flat affect and was often sad.  (*Id*.)  They further indicated that she: lacked energy and motivation; had a history of trauma; was manic at times; avoided crowds and people; had increased anxiety and panic in public; isolated often; had poor sleep and nightmares; and was hypervigilant.  (*Id*.)

### *2021 LPC Boylan*

On August 13, 2021, Kate Boylan, LPC, also completed a check-box style Medical Source Statement – Mental Capacity form that rated the same areas of functioning as LPCC Peticca and Dr. Miller rated in 2018.[4]  (Tr. 1917-20.)

LPC Boylan opined that Ms. Ratliff had *mild* limitations in the following areas: follow one or two step oral instructions to carry out a task; initiate or sustain conversation; initiate and perform a task that she understands and knows how to do; and set realistic goals.  (Tr. 1919-20.)

LPC Boylan opined that Ms. Ratliff had *moderate* limitations in the following areas: understand and learn terms, instructions or procedures; describe work activity to someone else; ask and answer questions and provide explanations; recognize a mistake and correct it; identify and solve problems; sequence multi-step activities; use reason and judgment to make work

---

[4] Tr. 1917-18 appears to be an incomplete and undated version of Tr. 1919-20.

related decisions; cooperate with others; ask for help when needed; state own point of view; respond to requests, suggestions, criticism, correction and challenges; keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; change activities or work settings without being disruptive; work close to or with others without interrupting or distracting them; distinguish between acceptable and unacceptable work performance; maintain personal hygiene and attire appropriate to a work setting; and be aware of normal hazards and take appropriate precautions.  (Tr. 1919-20.)

LPC Boylan opined that Ms. Ratliff had *marked* limitations in the following areas: handle conflicts with others; ignore or avoid distractions while working; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods; respond to demands; adapt to changes; manage one's psychologically based symptoms; and make plans for oneself independent of others.  (Tr. 1919-20.)

LPC Boylan found no *extreme* limitations.  (Tr. 1919-20.)  In a few areas, LPC Boylan opined that Ms. Ratliff's limitations fell within a range.  (*Id*.)  As to the ability to understand and respond to social cues, LPC Boylan opined that Ms. Ratliff's limitations ranged from *mild* to *moderate* to *marked* limitations, noting it was "situational."  (Tr. 1919.)  As to the ability to work at an appropriate and consistent pace or complete tasks in a timely manner, LPC Boylan opined that Ms. Ratliff's limitations ranged from *moderate* to *marked*.  (Tr. 1920.)

When asked to identify Ms. Ratliff's diagnoses and medical and clinical findings that supported her assessment, LPC Boylan identified the following diagnoses: bipolar disorder and PTSD.  (Tr. 1920.)  She stated that Ms. Ratliff suffered from direct traumatic experiences, homelessness, racing thoughts, difficulty focusing, and global sleep disturbances.  (*Id*.)

17

### ii.    Consultative Examiner

On April 26, 2017, Ms. Ratliff presented to clinical psychologist Deborah Koricke, Ph.D., at the Center for Effective Living for a psychological evaluation.  (Tr. 348-54.)  She reported problems with concentration, coping with stress, and being in public.  (Tr. 349.)  When asked to describe her impairment, she said: "I have PTSD and depression.  It disrupts my life." (Tr. 348.)

Dr. Koricke's mental status examination findings reflect that Ms. Ratliff presented with a neat appearance and adequate hygiene.  (Tr. 350.)  Her gait was slow and steady, and she walked without an assistive device.  (Tr. 351.)

Ms. Ratliff was agitated, depressed, anxious, and sad, but she was also polite and cooperative throughout the evaluation.  (Tr. 350-51.)  She openly shared information about her life, but it was difficult to engage her in conversation because she had a hard time composing herself.  (Tr. 351.)  She made intermittent contact during the evaluation, and presented as anxious, emotionally labile, easily upset, and sad.  (*Id*.)  Her affect was blunted and she complained of acute episodes of anxiety and panic, with panic attacks several times each week. (*Id*.)  She complained of feeling useless and agitated, and of having no energy or motivation to perform tasks.  (*Id*.)  She reported past suicidal ideation but denied current suicidal ideation. (*Id*.)  She reported having nightmares, flashbacks, and startle responses to loud stimuli.  (*Id*.) She did not demonstrate paranoid or obsessive thought processes.  (*Id*.)

Ms. Ratliff had no difficulty understanding questions or instructions, including complex or multi-step instructions.  (Tr. 351.)  Her memory for her history was adequate.  (*Id*.)  Her level of attention and concentration was variable, as she struggled to stay focused throughout her evaluation and lost her train of thought when performing mental status tasks.  (*Id*.)  However, she

"attended to the conversation at hand without observable difficulty" and "her thinking was reality bound." (*Id*.) She was oriented in all spheres. (*Id*.) She could perform a few serial sevens, but then lost her train of thought. (*Id*.) She completed five digits forward and three digits backward. (Tr. 351-52.) She could recall two out of three items after a five-minute delay. (Tr. 352.) Her abstract thinking and social judgment were within normal limits. (*Id*.) Her insight was good and her judgment was not impaired. (*Id*.) She was estimated to be functioning within the average range of intelligence. (*Id*.)

Ms. Ratliff was diagnosed with bipolar disorder, post-traumatic stress disorder, and panic disorder without agoraphobia. (Tr. 352.) In assessing Ms. Ratliff's limitations in understanding, remembering, and carrying out instructions, Dr. Koricke opined that Ms. Ratliff had no problems with comprehension or understanding questions or instructions, including complex or multi-step instructions, and had adequate memory for her history, but that her "ability to remember instructions may be negatively affected by the lapses in attention" and her "lapses in sustained attention make it difficult for her to fully remember what she has been told." (Tr. 352-53.) In assessing Ms. Ratliff's limitations in maintaining attention, concentration, persistence, and pace to perform tasks, Dr. Koricke noted that Ms. Ratliff's attention and concentration were variable during the evaluation, she struggled to stay focused, and she showed attention problems on mental status tasks. (Tr. 353.) Dr. Koricke also observed that she reported problems staying on task at home due to distractibility and inattention "such that work pace is slowed." (*Id*.) In assessing Ms. Ratliff's limitations in responding appropriately to supervisors and coworkers in the work setting, Dr. Koricke noted that Ms. Ratliff presented as a passive, depressed, and anxious individual, such that rapport was difficult to establish, and that she presented as "having limitations in her ability to respond to others in the work place because of her emotional

19

symptoms associated with a bipolar disorder, panic disorder, and post-traumatic stress disorder."
(*Id.*)  As to Ms. Ratliff's limitations in responding appropriately to work pressures in a work
setting, Dr. Koricke opined that "exposure to work pressures may increase [Ms. Ratliff's] bipolar
symptoms and anxiety symptoms related to PTSD and panic disorder, and she [did] not have
effective coping skills to manage emotional outbursts."  (*Id.*)

### iii.    State Agency Medical Consultants

On March 31, 2017, state agency medical consultant Gerald Klyop, M.D., completed a
physical RFC assessment.  (Tr. 142-44.)  He opined that Ms. Ratliff could: occasionally lift
and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for six hours in
an eight-hour day; sit for six hours in an eight-hour day; never climb ladders/ropes/scaffolds;
occasionally crawl; and frequently balance, stoop, kneel, crouch, and climb ramps and stairs. (Tr.
142-143).  Upon reconsideration, on August 2, 2017, state agency medical consultant Mehr
Siddiqui, M.D., affirmed Dr. Klyop's physical RFC assessment.  (Tr. 161-62.)

On May 12, 2017, state agency psychological consultant Cynthia Waggoner, Psy.D.,
completed a Psychiatric Review Technique ("PRT") (Tr. 140-41) and a mental RFC assessment
(Tr. 144-46).  In the PRT, Dr. Waggoner opined that Ms. Ratliff had mild limitations in her
ability to: understand, remember, or apply information, and moderate limitations in her ability to
interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr.
140.)  In her mental RFC assessment, Dr. Waggoner opined that Ms. Ratliff could: perform one
to three step tasks in a routine work environment; have superficial contact with coworkers,
supervisors, and the general public; and handle infrequent changes in routine that can be readily
explained with no strict time demands.  (Tr. 144-46.)  Upon reconsideration, on August 1, 2017,

state agency psychological consultant Robyn Murry-Hoffman, Ph.D., affirmed Dr. Waggoner's PRT and mental RFC assessment.  (Tr. 158-59, 162-64.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

#### i.    February 5, 2019 Hearing

At the hearing conducted on February 5, 2019, Ms. Ratliff testified in response to questioning by the ALJ and her representative.  (Tr. 105-21.)  She testified to working as a cashier in 2007, but she said the job did not last due to attendance problems, as her depression kept her from showing up for work on some days.  (Tr. 105-06.)  She explained that she was fired often because she did not get along or communicate well with coworkers or supervisors, noting that she had problems with authority figures at times, especially if they were men.  (Tr. 120-21.)  She did not feel she could work a full-time job because of anxiety and agoraphobia, which started around 2002 and made it difficult for her to go out in public.  (Tr. 111.)

She said her depression and agoraphobia had gotten worse since 2002.  (Tr. 112.)  She had suicidal thoughts every couple of months, often triggered by her financial situation, lack of employment, and depression.  (*Id*.)  About five times a week, she had panic attacks that caused shortness of breath and made her feel like she was suffocating; they were triggered by being close to people.  (Tr. 113-14.)  She had a lot of nightmares (Tr. 116-17) and had difficulty staying asleep and falling back to sleep if she woke up at night (Tr. 115).  She had short and long-term memory and concentration problems.  (Tr. 116.)  Because of her PTSD, she said she would jump if someone approached her from behind, even her mother.  (Tr. 120.)

Ms. Ratliff also reported that migraines and fatigue contributed to her inability to work. (Tr. 117-118.)  As to her fatigue, she said she napped every day, nodded off during the day at

times, and fell asleep involuntarily. (Tr. 115, 118-19.) Her medical providers suspected that her fatigue was a medication side effect, but they were not certain. (Tr. 118.) As to her migraines, she said she had been having migraines four to five times a week for two or three years; her migraines caused shooting pain and sensitivity to light. (Tr. 119.) When she had a migraine, she had to lie down. (*Id*.) She took medication for her migraines but did not feel the medication helped; when she took her medication, she usually felt sick for the rest of the day. (*Id*.)

Ms. Ratliff's mental health treatment included seeing her psychiatrist every two months and seeing her therapist once or twice a month. (Tr. 117.) Her psychiatrist prescribed medication, which was adjusted over time. (*Id*.) She had been on Lamictal and Pristiq for about five years, and her psychiatrist had recently added Latuda. (*Id*.)

Ms. Ratliff lived with her mother, and they shared the housework. (Tr. 106.) She did the grocery shopping because her mother was physically unable to go out to the store. (Tr. 107, 112.) She usually went to the store two or three times each week. (Tr. 113.) She did not have her driver's license. (Tr. 107.) She had anxiety attacks when she tried to take the driver's test and could not pass it. (*Id*.) Because the grocery store was close to her home she could walk there. (Tr. 113.) She also took the bus or other public transportation, but it was difficult for her because being close to people triggered a panic attack. (Tr. 107, 114.) When she went to the store, she went early to avoid being around a lot of people. (*Id*.) She spent time watching videos and reality televisions shows. (Tr. 108.) She enjoyed reading comics and books, but she said she had a hard time concentrating and would forget what she had read. (Tr. 108, 116.) She studied creative writing when she was in college, but did not really do much writing anymore. (Tr. 108-09.) She had a hard time finding "creative things" to write about. (Tr. 108.)

Ms. Ratliff did not have any friends.  (Tr. 110.)  She occasionally kept in contact with an aunt who lived out of state.  (*Id*.)  She did not associate with her neighbors, feeling it was best to keep to herself because individuals in her building could be "gossips and busybodies."  (*Id*.)

### ii.        September 24, 2021 Hearing

At the telephonic hearing conducted on September 24, 2021, Ms. Ratliff testified in response to questioning by the ALJ and her representative.  (Tr. 1436-49.)  She lived in an apartment with her mother and did not have a driver's license.  (Tr. 1436-37, 1443, 1444.)  She used the public bus system but reported sometimes getting lost trying to navigate the bus system.  (Tr. 1437-38.)  She had not worked since 2006.  (*Id*.)

Ms. Ratliff reported that her anxiety interfered with her ability to work.  (Tr. 1438.)  She had anxiety when she left the house and would panic if people were too close to her.  (*Id*.)  She said that her inability to work was ninety percent due to her mental health conditions, but that her physical impairments were also a factor.  (*Id*.)  She had diabetic neuropathy that made it hard for her to stand on her feet for more than five to ten minutes.  (*Id*.)  She had pain in her feet and lower back.  (Tr. 1439.)  Her foot pain was constant, with the more severe pain lasting about two hours.  (*Id*.)  Her back pain came and went throughout the day.  (*Id*.)  She rated her foot pain between an eight and eight-and-a-half out of ten, even with medication, and rated her back pain a seven out of ten without medication.  (Tr. 1439-40.)  She estimated she could comfortably: sit for about thirty minutes; stand for five to ten minutes; walk for ten minutes or about a half mile; and lift about two pounds.  (Tr. 1440.)

Ms. Ratliff did not have problems remembering to take care of her personal hygiene.  (Tr. 1440.)  She did some household chores, including washing her own dishes, making quick meals for herself, sweeping her room twice a week, dusting her room once a month, doing laundry once

a month, and cleaning up the bathtub sometimes; but if the bathtub needed to be scrubbed, she could not do it because it required her to bend over.  (Tr. 1442-43.)  She had some difficulty making change and counting money.  (Tr. 1442.)  She spent her time reading, mostly e-books.  (Tr. 1440-41.)  She usually read fiction books and estimated that she could read one book per month; her books averaged between 200 and 300 pages.  (Tr. 1441.)  She had some difficulty focusing or following the plot or story, and sometimes had to re-read passages in the book.  (*Id*.)  She used a computer to contact doctors or pay bills, but she did not use social media.  (Tr. 1442.)  She did not spend time with family or friends on a regular basis.  (Tr. 1440.)

Ms. Ratliff reported some side effects from her medications.  (Tr. 1443.)  Her thyroid medication had been changed recently because it made her very sleepy and caused her to nap a lot.  (*Id*.)  Her mental health medications also made her sleepy.  (*Id*.)  Her migraine medication was discontinued because it was making her sick.  (*Id*.)

Ms. Ratliff reported that she was working on improving her health conditions, but her anxiety continued to prevent her from going out places.  (Tr. 1443.)  She said her mental health symptoms could be aggravated by a lot of things, including "news and politics," needing to go out somewhere, and family.  (*Id*.)  She had a hard time interacting with people and said there was not a real difference between interacting with people she knew versus strangers, noting that it was "probably worse with people that [she] [knew]."  (Tr. 1444.)  It was worse for her if she had to interact with a group, and she defined a group as three to five people.  (*Id*.)  Ms. Ratliff's mental health providers for the past five or six years were at the Center for Effective Living.  (Tr. 1445.)  Prior to the pandemic, she was seeing her therapist twice a month; but due to the pandemic, she was only able to do phone appointments with her therapist once a month.  (*Id*.)  She also saw her psychologist for medication once a month.  (*Id*.)  She was trying to get into a

24

depression treatment program at the Center for Effective Living, which would involve attending appointments every week or every other week.  (Tr. 1446.)

Ms. Ratliff left her house only for groceries and to attend doctor appointments when they were in person rather than remote.  (Tr. 1446.)  The last time she could remember leaving her house for something else was four years earlier when she went to the theater.  (*Id*.)  She had no friends that visited, and she did not visit with family other than her mother.  (*Id*.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the September 24, 2021 hearing.[5]  (Tr. 1449-54.) The ALJ informed the VE that there was no past relevant work.  (Tr. 1449.)  In the second hypothetical question, the ALJ asked the VE to consider an individual of Ms. Ratliff's age and education who could perform light work, with the following additional limitations: occasionally operate right and left foot controls; frequently operate right and left hand controls; occasionally lift overhead with the right and left; frequently reach in all other directions with right and left; frequently handle with right and left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, kneel, stoop, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts or operate a motor vehicle; has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine and repetitive tasks but not at a production rate pace, i.e. assembly line work; limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors, coworkers and the public. (Tr. 1450-51.)  The VE testified that the described individual could perform the following light, unskilled representative jobs: office helper, stock checker, and mail clerk.  (Tr. 1451.)

---

[5] A Vocational Expert also testified at the hearing in 2019.  (Tr. 121-25.)

In response to the sixth hypothetical, the ALJ asked the VE to assume each of the first five hypotheticals with the additional limitations: the individual would be off task 20% of an eight-hour workday and/or would be absent from work two days per month.  (Tr. 1452-53.)  The VE testified that those limitations would eliminate all competitive employment, and further testified that the acceptable amount of time for being off task was no more than 10% of the work day and the acceptable amount of absenteeism was no more than six days per year.  (Tr. 1453.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV.     The ALJ's Decision

In his November 2, 2021 decision, the ALJ made the following findings:[6]

1.      The claimant has not engaged in substantial gainful activity since January 19, 2017, the application date.  (Tr. 1397.)

2.      The claimant has the following severe impairments: diabetes with neuropathy; post-surgical hypothyroidism; status-post thyroid cancer; mild left acromioclavicular joint degenerative changes; essential hypertension; hyperlipidemia; migraine headaches; mild obstructive sleep apnea; hepatic steatosis; obesity; depression; bipolar disorder; anxiety/panic disorder with agoraphobia; borderline personality disorder; and post-traumatic disorder ("PTSD").  (*Id.*)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 1397-1404.)

4.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except occasionally operate right and left

---

[6] The ALJ's findings are summarized.

foot controls; frequently operate right and left hand controls; occasionally reach overhead with the right and the left; frequently reach in all other directions with the right and the left; frequently handle with the right and the left; frequently finger with right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production pace rate (i.e., assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors, coworkers, and the public.  (Tr. 1404-16.)

5.    The claimant has no past relevant work.  (Tr. 1416.)

6.    The claimant was born in 1980 and was 36 years old, defined as a younger individual age 18-49, on the date the application was filed.  (*Id*.)

7.    The claimant has at least a high school education.  (*Id*.)

8.    Transferability of job skills is not material to the determination of disability.  (*Id*.)

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including office helper, stock checker, and mail clerk.  (Tr. 1416-17.)

Based on the foregoing, the ALJ determined that Ms. Ratliff had not been under a disability, as defined in the Social Security Act, since January 19, 2017, the date the application was filed.  (Tr. 1417.)

## V.    Plaintiff's Arguments

Plaintiff presents three assignments of error.  First, she argues that the ALJ erred in giving little weight to the opinions of LPCC Peticca, LPC Boylan, and Dr. Miller.  (ECF Doc. 10, pp. 1, 15-20.)  Second, she argues that the ALJ erred by not finding that her impairments met or equaled Listing 12.04.  (*Id*. at pp. 1, 20-23.)  Third, she argues that the ALJ erred by not

28

taking into account how her fatigue, malaise, and medical appointments would limit her ability to be present and productive on a full-time, ongoing basis.  (*Id.* at pp. 1, 23-25.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Erred in Evaluating Medical Opinions**

In her first assignment of error, Ms. Ratliff argues that the ALJ erred in assigning "little weight" to (1) the 2018 opinion of LPCC Peticca and Dr. Miller ("Miller opinion") and (2) the 2021 opinion of LPC Boylan ("Boylan opinion").[7]  (ECF Doc. 10, pp. 1, 15-20.)  Specifically, she argues the ALJ erred because: the two opinions are consistent with each other; the medical records support the opinions; and the opinions are corroborated by the findings of the consultative examiner.  (*Id*. at p. 15.)  The Commissioner argues in response that the ALJ properly considered and weighed the medical opinions, taking into account the opinions' consistency with the record, including the treating sources' own examination findings, Ms.

---

[7] Plaintiff does not challenge the weight assigned to the 2017 opinion of LPCC Peticca.

Ratliff's reported activities, and the opinions of the state agency consultants and consultative examiner.  (ECF Doc. 12, pp. 8-11.)

### 1.    Governing Legal Standards

Ms. Ratliff filed her application on January 19, 2017.  (Tr. 81, 249-54, 1395.)  Because she filed her claim before March 27, 2017, the prior rules for evaluating opinion evidence apply.[8] Those regulations provide that every medical opinion will be evaluated, no matter its source, *see* 20 C.F.R. § 416.927(c), but there is a hierarchy for evaluating medical opinions in which the well-supported opinion of a treating physician is entitled to controlling weight, *see* 20 C.F.R. § 416.927(c)(2), and the opinion of an examining but non-treating medical source is given more weight than a non-examining medical source, *see* 20 C.F.R. § 416.927(c)(1).

The Sixth Circuit has provided detailed instructions regarding the weight to be given the opinion of a treating source under the prior regulations:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

> If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id*. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This

---

[8] Plaintiff incorrectly cites to the regulations applicable to claims filed after March 27, 2017, asserting that "consistency" and "supportability" are the most important factors under the regulations.  (ECF Doc. 10, pp. 16-20.) Those two factors are not identified as the most important factors under the applicable regulations, but they were still appropriate factors to consider when weighing medical opinion evidence.  *See* 20 C.F.R. § 416.927(c).  The Court will therefore consider Plaintiff's arguments, but will analyze them under the applicable regulatory standard.

> procedural requirement "ensures that the ALJ applies the treating physician rule
> and permits meaningful review of the ALJ's application of the rule." *Wilson v.
> Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). While ALJs are required to

consider the factors in 20 C.F.R. § 416.927(c)(2) in deciding what weight to give to treating

source opinions, they are not required to provide a factor-by-factor analysis; their decisions need

only include "good reasons" for the weight assigned. *Francis v. Comm'r Soc. Sec. Admin.*, 414

F. App'x 802, 804 (6th Cir. 2011).

When an ALJ does not give a treating source opinion "controlling weight," they should

consider the factors set forth in 20 C.F.R. § 416.927(c)—examining relationship, treating

relationship, supportability, consistency, specialization, and other factors tending to support or

contradict the medical opinion—when "deciding the weight [to] give to any medical opinion."

*See* 20 C.F.R. § 416.927(c); *see also Beery v. Comm'r of Soc. Sec.*, 819 F. App'x 405, 408 (6th

Cir. 2020) ("In evaluating the opinion of an examining but nontreating physician, 'the ALJ

should consider factors including the length and nature of the treatment relationship, the

evidence that the physician offered in support of her opinion, how consistent the opinion is with

the record as a whole, and whether the physician was practicing in her specialty.'") (quoting *Ealy

v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)).

Medical opinions are "statements from acceptable medical sources," 20 C.F.R. §

416.927(a)(1), which include licensed physicians (medical or osteopathic doctor) and licensed

psychologists, 20 C.F.R. 416.902(a). Under the applicable regulations, neither a physical

therapist, a licensed social worker, nor a licensed nurse practitioner is an acceptable medical

source. *See* 20 C.F.R. § 416.902. Nevertheless, the Social Security Administration emphasized

that opinions from "medical sources, who are not technically deemed 'acceptable medical

sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 71 Fed. Reg. 45593, 45595 (August 9, 2006) (rescinded for claims filed on or after March 27, 2017, *see* 82 Fed. Reg. 15263 (March 27, 2017).) Thus, "an opinion from a medical source who is not an acceptable medical source . . . may outweigh the medical opinion of an acceptable medical source." 20 C.F.R. § 416.927(f). The same factors used in evaluating opinions by acceptable medical sources remain relevant, as those factors "represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources.'" SSR 06-03p, 71 Fed. Reg. at 45595.

With these governing legal standards in mind, the Court will turn to Ms. Ratliff's argument that the ALJ erred in evaluating the Miller and Boylan opinions. In doing so, the Court observes that LPCC Peticca and LPC Boylan are not acceptable medical sources, *see* 20 C.F.R. § 416.902, and their opinions are not entitled to treating source deference, *see* 20 C.F.R. §§ 416.927(a)(1), (c)(2). In contrast, Dr. Miller is an acceptable medical source entitled to deference. *See* 20 C.F.R. 416.902(a). The Miller opinion will therefore be evaluated under the deferential treating source standard, while the Boylan opinion will be evaluated under the standard applicable to medical sources that are not "acceptable medical sources."

## 2. Whether ALJ Erred in Evaluating the Miller and/or Boylan Opinions

Following a discussion of Ms. Ratliff's mental health treatment history, including her treatment with Dr. Miller, LPCC Peticca, and LPC Boylan, and the psychological consultative examination (Tr. 1400-04, 1408), the ALJ assigned "little weight" to both the Miller opinion (Tr. 1414-15) and the Boylan opinion (Tr. 1415-16).

As to the Miller opinion, the ALJ acknowledged that Dr. Miller's opinion was subject to the treating source standard, but noted that the following analysis applied: "if it is found that a treating source's medical opinion on the issue of the nature and severity of the claimant's impairments is not well supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other evidence of record, it will not be given controlling weight."[9]  (Tr. 1414.)  After explaining that he evaluated the Miller opinion under the factors in 20 CFR 416.927(c), the ALJ assigned "little weight" to the opinion based on the following reasons and supporting explanations.  (*Id.*)  First, the ALJ explained:

> [Dr. Miller and LPCC Peticca's] own examination findings do not reflect a marked or extreme limitation in any area of mental functioning. The claimant's mental health treatment records from Center for Effective Living include very few objective findings []. The few exam findings noted include a pleasant mood and appropriate affect []; engaging well []; "appropriate range mood/affect" []; fully oriented, friendly, cooperative, constricted affect, sad/tired mood, good insight and judgment []; and a good mood and affect [].

(Tr. 1414 (emphasis added) (citations omitted).)  Second, he explained that the opinion was "inconsistent with the other evidence of record" because:

> The claimant's reported daily functioning does not support a marked, serious, or worse degree of limitation in any areas of mental functioning. She noted that she is able to take public transportation, but sometimes has difficulty navigating transfers; she remembers to perform selfcare; she reads fiction books of 200-300 pages, monthly; she uses the internet and computer to pay utility bills and contact her doctors; she is sometimes able to make change and count money; and she perform[s] some household chores, including dishes, cleaning, sweeping, and laundry [].

(*Id.* (emphasis added) (citations omitted).)  The ALJ also found the Miller opinion to be inconsistent with Ms. Ratliff's mental status findings, which he concluded "do not support more than a fair or moderate degree of limitation in any areas of mental functioning."  (*Id.*)  In support,

---

[9] The ALJ also noted that LPCC Peticca was not an acceptable medical source, and that her opinions were therefore evaluated under the standard for evidence from a source other than an acceptable medical source.  (Tr. 1414.)

the ALJ quoted specific examination findings dating from 2017 through 2021, reflecting that Ms. Ratliff presented as depressed and anxious with a constricted or blunt affect at times, but was also well-groomed, cooperative with clear speech, logical thoughts, and euthymic affect.  (Tr. 1414-15.)  While recognizing that "these examinations show some degree of impairment," the ALJ concluded that "they do not show a marked or serious degree of difficulty in any areas of functioning."  (Tr. 1415.)  Finally, the ALJ observed that the state agency psychological consultants' opinions—which found mild or moderate limitations in all areas of mental functioning—did not support and were inconsistent with the Miller opinion's findings that Ms. Ratliff had marked or extreme limitations in specified areas of mental functioning.  (*Id*.)

Turning to the Boylan opinion, the ALJ explained that he evaluated the opinion as evidence from a source other than an acceptable medical source, considered the factors in 20 CFR 416.927(c), and assigned the opinion "little weight"; he then articulated explanations for his findings that mirrored his analysis of the Miller opinion, including observations that reports of daily functioning and mental status examination findings in the evidentiary record did not support marked limitations, and that the state agency psychological consultants' opinions did not support and were inconsistent with LPC Boylan's opinion that Ms. Ratliff had marked limitations in the several areas of mental functioning.  (Tr. 1415-16.)

In support of her assertion that the ALJ erred by giving "little weight" to the two opinions, Ms. Ratliff argues: (1) although the ALJ noted very few "objective medical findings" in the providers' records, mental health opinions should not be rejected based on a lack of objective findings because "clinical and laboratory data" for mental illness "may consist of the diagnosis and observations of professionals" (ECF Doc. 10, pp. 17-18 (citation omitted)); (2) the ALJ ignored that the providers' medical records reference symptoms, observations, and

medication changes that are consistent with the limitations in the two opinions (*id.* at pp. 18-19); and (3) the provider opinions are consistent with one another and Dr. Koricke's consultative examination findings (*id.* at p. 19).  The Commissioner argues in response that the ALJ properly considered the opinion evidence and reasonably concluded that the findings of marked or extreme limitations were inconsistent with: the providers' own clinical examination findings; Ms. Ratliff's reported activities of daily living; and the findings of the state agency psychological consultants.  (ECF Doc. 12, pp. 9-10.)  And as to Ms. Ratcliff's argument that her providers' records support the limitations articulated in the two opinions, the Commissioner responds that remand is not warranted, regardless of whether that is true, because that "the ALJ reviewed the same records and reached a reasonable, albeit different conclusion."  (*Id.* at pp. 10-11.)

The Court agrees that Ms. Ratliff does not squarely address the relevant legal standard when she argues that certain medical records and/or opinions support or are consistent with the Miller and Boylan opinions.  Even if a preponderance of the evidence supports giving more than "little weight" to those opinions, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[s] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Even as to the treating source opinion, the ALJ need not provide more than "good reasons" for the weight assigned, *Francis*, 414 F. App'x at 804, with those reasons being "supported by the evidence in the case record" and "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 61 Fed. Reg. 34489, 34492 (July 2, 1996)).  Thus, the questions before this Court are whether the ALJ failed to articulate "good reasons" for assigning little weight to the Miller opinion, and

whether he lacked substantial evidence to support the little weight given to the Miller and Boylan opinions.  The Court finds that Mr. Ratliff has not met her burden to make either showing.

First, the Court finds no merit in Ms. Ratliff's argument that the ALJ erred in noting that the provider records "contained very few 'objective medical findings'" because "psychological symptoms . . . and opinions cannot simply be written off by asserting they are not objectively based."  (ECF Doc. 10, pp. 17-18 (citation omitted).)  The ALJ's analysis reveals that he did not simply give little weight to the Miller opinion because his records included "very few objective findings," but went on to specifically detail the objective findings that *were* included in the Center for Effective Living records and to conclude that those findings "do not reflect a marked or extreme limitation in any area of mental functioning."  (Tr. 1414.)  He also considered her self-reported activities of daily living and mental examination findings with the consultative examiner and other providers, concluding: "[w]hile these examinations show some degree of impairment, they do not show a marked or serious degree of difficulty in any areas of functioning."  (Tr. 1414-15.)  Ms. Ratliff has failed to show that the ALJ's consideration of her mental status findings deprived his opinion analysis of good reasons or substantial evidence.

Second, the Court does not find merit in Ms. Ratliff's assertion that "the ALJ ignored the primary issues that the medical evidence was supported and consistent with" the opinions.  (ECF Doc. 10, p. 18.)  As noted above, the proper questions are whether the ALJ failed to articulate good reasons or lacked substantial evidence to support his findings.  Ms. Ratliff does not clearly articulate what evidence she contends the ALJ ignored, and a comparison of her arguments and the ALJ decision do not clarify the issue.  For example, she observes that the records note reported symptoms and limitations (*id.*), but the ALJ decision acknowledges reported symptoms and limitations (*see* Tr. 1400-04, 1406, 1409-10).  She notes that LPCC Peticca completed a

37

questionnaire discussing Ms. Ratliff's symptoms and reported limitations and opining that she would have difficulty tolerating work stress (ECF Doc. 10, pp. 18-19 (citing Tr. 1328)), but the ALJ provided a detailed analysis of that opinion and clearly articulated his reasons for giving the opinion little weight (Tr. 1412-14).[10]  She also notes that Dr. Miller's records document medicine changes in response to Ms. Ratliff's symptoms.  (ECF Doc. 10, p. 18.)  While the ALJ did not specifically discuss changes to Ms. Ratliff's psychiatric medications, he did acknowledge that she was attending medication management appointments (Tr. 1408) and discussed the objective findings in her treatment records at some length (*see, e.g.,* Tr. 1400-04, 1408).  The Sixth Circuit has long held that an ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  Ms. Ratliff has not shown that the medication adjustments demonstrate that she suffered marked or extreme limitations and, more importantly, has not shown that the ALJ's failure to discuss those medication changes deprived his analysis of good reasons or otherwise deprived his findings of the support of substantial evidence.

Finally, the Court is not convinced by Ms. Ratliff's argument that "the opinions of Dr. Miller, Ms. Boylan, and Ms. Peticca are not only internally consistent, but []consistent with the [consultative] evaluation performed by Dr. Koricke."  (ECF Doc. 10, p. 19.)  The ALJ gave detailed explanations for his decision to give "little weight" to the Miller and Boylan opinions, observing in particular that the objective evidence and reported daily activities were inconsistent with the marked or extreme limitations identified in those opinions.  (Tr. 1414-16.)  The ALJ also considered the objective mental status findings (Tr. 1408) and medical opinion (Tr. 1412) of

---

[10] Ms. Ratliff has not challenged the ALJ's finding that the 2017 LPCC Peticca opinion warrants "little weight."

consultative examiner Dr. Koricke, and assigned the opinion partial weight because portions of the opinion—like those "noting that the claimant's work pace is slowed, she 'has limitations', and that work pressures 'may' increase her symptoms"—were vague and not well defined, but also concluding that the opinion did not "clearly suggest greater limitations than those set forth in the . . . [RFC] assessment." (*Id.*) Thus, while Ms. Ratliff suggests that Dr. Koricke's opinion amounted to a finding of "severe deficits in multiple areas of her mental functioning," (ECF Doc. 10, p. 19), the ALJ explicitly found otherwise. Regardless of whether consistencies between the relevant opinions could support giving the Miller and Boylan opinions greater weight, this Court cannot overturn the ALJ's contrary decision unless the ALJ failed to articulate good reasons to support giving little weight to the Miller opinion or lacked substantial evidence to support giving little weight to either opinion. Ms. Ratliff has not shown that either standard was met.

For the reasons set forth above, the Court finds that Ms. Ratliff has not met her burden to show that the ALJ erred in assigning little weight to the Miller or Boylan opinions, or that he failed to adequately explain his rationale for assigning little weight. Instead, the Court finds that the ALJ thoroughly and sufficiently explained his reasons for assigning little weight to the opinions, that those reasons are good reasons supported by substantial evidence, and that the ALJ's assignment of little weight to the Miller and Boylan opinions was supported by substantial evidence. Accordingly, the Court finds Ms. Ratliff's first assignment of error is without merit.

**C.** **Second Assignment of Error: Whether ALJ Erred at Step Three**

In her second assignment of error, Ms. Ratliff argues that the ALJ erred at Step Three because substantial evidence showed that her mental impairments met or equaled Listing 12.04. (ECF Doc. 10, pp. 1, 20.) In particular, she argues that substantial evidence supported a finding that she had marked limitations in interacting with others and concentrating, persisting, and

39

maintaining pace. (*Id.* at pp. 20-23.) The Commissioner responds that Ms. Ratliff is asking the Court to reweigh the evidence, as the ALJ's finding of moderate limitations in all areas of mental functioning was reasonable and supported by substantial evidence. (ECF Doc. 12, pp. 11-15.)

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii). The claimant bears the burden of establishing that her condition meets or equals a Listing. *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)). Furthermore, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004).

Listing 12.04 pertains to depressive, bipolar and related disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.04. To meet Listing 12.04, a claimant must meet the criteria set forth in paragraph A and the criteria set forth in either paragraph B or paragraph C. Ms. Ratliff focuses her argument on the paragraph B criteria, which include four areas of mental functioning— understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself—for which a claimant must show extreme limitations in one area or marked limitations in two areas. 20 C.F.R. § 416.920a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E.

Here, Ms. Ratliff argues that substantial evidence supported a finding of marked limitations in (1) interacting with others and (2) concentrating, persisting, and maintaining pace. (ECF Doc. 10, pp. 1, 20-23.) She argues specifically that substantial evidence supports a finding

of marked limitations in those areas because of her mental diagnoses, her reported symptoms and functional limitations, the medical opinions of her providers, and the clinical observations and medical opinion of the consultative examiner.  (*Id.*)  While she identifies and highlights certain diagnoses, subjective reports, clinical findings, and medical opinion findings in support of a finding of marked limitations, she does not specifically identify what, if any, evidence the ALJ mischaracterized or failed to consider in reaching his own contrary conclusions regarding Ms. Ratliff's level of limitation.  As noted above, even if a preponderance of the evidence supports a finding of marked limitations, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[s] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Thus, the question before this Court is not whether substantial evidence supported marked limitations, but rather whether the ALJ *lacked* substantial evidence to support his contrary finding of moderate limitations.

In finding Ms. Ratliff had moderate limitations in interacting with others, the ALJ acknowledged her subjective complaints, but concluded that her "mental status findings do not support more than a fair or moderate degree of limitation in interacting with others"—citing numerous specific mental status examination findings in support—and further observed that the state agency psychological consultants had opined that she had moderate limitations in this area of functioning.  (Tr. 1401-02.)  And in finding that she had moderate limitations in concentrating, persisting, and maintaining pace, the ALJ acknowledged her relevant subjective complaints but concluded that her "exam findings do not demonstrate a marked, serious, or worse degree of limitation in concentrating persisting, or maintaining pace"—again citing numerous specific mental status findings in support—and observed that the state agency psychological consultants had found no more than moderate limitations.  (Tr. 1402-03.)

In addition to those Step Three findings, the ALJ went on to discuss Ms. Ratliff's subjective allegations, reported activities of daily living, medical treatment records, and the medical opinion evidence at Step Four.  (Tr. 1405-16.)  In that analysis, the ALJ gave little weight to the opinions of Ms. Ratliff's medical providers, and explained his reasons for doing so.[11]  (Tr. 1412-16.)  He gave considerable weight to the opinions of the state agency psychological consultants, who found Ms. Ratliff had moderate limitations in the functional areas at issue here, and again explained his reasons for doing so.  (Tr. 1411-12.)  And he gave partial weight to the opinion of the consultative psychological examiner, finding it to be vague but "not inconsistent with" the state agency consultants' opinions, specifying that he "d[id] not interpret this opinion to clearly suggest greater limitations than those set forth in the above [RFC] assessment."  (Tr. 1412.)

In challenging the ALJ's findings at Step Three, Ms. Ratliff does not explicitly argue that the ALJ lacked substantial evidence to support his findings of moderate limitations, and does not identify evidence that would deprive the ALJ's findings of the support of substantial evidence. Instead, she describes evidence that she believes supports a finding of marked limitations in the two relevant areas of mental functioning and argues that "remand is required for the ALJ to review all of the evidence and not just that evidence which supported h[is] decision[.]"  (ECF Doc. 10, pp. 21-23.)  But the inquiry required here is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess:

---

[11] For the reasons set forth in Section VI.B., *infra*, the Court found no merit in Ms. Ratliff's challenge to the ALJ's decision to give little weight to the Miller and Boylan opinions, and that determination will not be revisited here. Ms. Ratliff has not challenged the weight given to any other medical opinions in the record.

'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

For the reasons set forth above, the Court finds that the ALJ's Step Three findings regarding Listing 12.04 have the support of substantial evidence, and that Ms. Ratliff has not met her burden to establish otherwise.  Accordingly, the Court finds Ms. Ratliff's second assignment of error is without merit.

**D.      Third Assignment of Error: Whether ALJ Erred by Not Including Further RFC Limitations**

In her third assignment of error, Ms. Ratliff argues that further RFC limitations should have been included to account for the absenteeism and off task behavior that would have resulted from her "pain, fatigue, malaise, and medical appointments."  (ECF Doc. 10, pp. 1, 23-25.)  The Commissioner argues in response that the ALJ's RFC assessment was reasonable and supported by the record.  (ECF Doc. 12, pp. 15-16.)

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 416.946(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Here, Ms. Ratliff argues that the ALJ should have included additional RFC limitations finding she would be off task more than 10% of the workday or absent more frequently than once every two months because of her pain, fatigue, malaise, social isolation, limited activities of

daily living, medical appointments, and migraines.  (ECF Doc. 10, p. 24.)  She asserts that remand is required so that the ALJ may reassess her RFC "once all of her symptoms have been taken into account."  (*Id.*)  The Commissioner responds that the ALJ considered her reported symptoms but reasonably concluded that her testimony and allegations were "not entirely consistent with the record as a whole."  (ECF Doc. 12, p. 15 (citing Tr. 1406-07).)  As discussed in prior sections, the question before the Court is whether the ALJ *lacked* substantial evidence to support his RFC limitation, not whether the evidence could support greater limitations.

A review of the ALJ decision reveals that he took Ms. Ratliff's allegations regarding pain, fatigue, treatment, and flare-ups into account when assessing her RFC.  First, the ALJ acknowledged at Step Two that Ms. Ratliff's severe impairments included: diabetes with neuropathy; post-surgical hypothyroidism, status-post thyroid cancer; migraine headaches; and mild obstructive sleep apnea.  (Tr. 1397.)  At Step Four, he acknowledged her allegations of pain in her feet, back, and hands, and medication side effects that included drowsiness.  (Tr. 1406.)  The ALJ then explained that he considered other factors in assessing her complaints of pain and other symptoms—including her daily activities, the nature of her symptoms, precipitating or aggravating factors, medications and side effects, and other treatments and measures used to relieve her symptoms—and concluded that Ms. Ratliff's testimony and allegations regarding her symptoms were "not entirely consistent with the record as a whole."  (Tr. 1406-07, 1409.)  The ALJ then summarized the medical treatment records in support, including the following:

- Head imaging for evaluation of headaches in March 2017 was unremarkable;

- Similar imaging in March 2018 showed no acute intracranial process;

- Her sleep apnea was mild and was treated with a CPAP machine;

- Her gait, strength, and reflexes were normal at various times, but she had some reduced reflexes in the triceps and left ankle and hyperesthesia in the hand, fingers, and feet in December 2020; and

44

- A December 2020 skin biopsy was consistent with moderate small fiber sensory neuropathy, for which her physician recommended control of blood glucose levels and use of Cymbalta to reduce tingling and burning sensations.

(Tr. 1407-08.)  Following that discussion, the ALJ observed that Ms. Ratliff's activities of daily living did not necessarily reflect the claimed level of physical limitation, and explained that her "physical examination findings show, at worst, some reduced sensation and reflexes; however, her examination findings were generally unremarkable for deficits with sensation, reflexes, gait, range of motion, and strength," citing numerous specific records in support.  (Tr. 1409.)  Finally, the ALJ provided the following further explanation to support his ultimate RFC assessment:

> The pain, fatigue, effects of treatment, and residual functioning related to flare-ups of the claimant's migraines, thyroid disorder, musculoskeletal impairments, diabetic neuropathy, cardiovascular impairments, pulmonary impairments, hepatic steatosis, and obesity, support limiting the claimant to no more than light exertion, with additional limitations on use of her upper and lower extremities, climbing, postural activities, environmental factors, and exposure to hazards, as noted above. The cumulative effects of the pain, fatigue, effects of treatment, and residual functioning related to physical impairments, in addition to the symptoms and effects of treatment related to the claimant's mental impairments, support limiting the complexity and routine nature of tasks, production and time demands, workplace changes, and the frequency of interactions with others, as noted above.

(Tr. 1411 (emphasis added).)  Thus, the ALJ did explicitly consider and account for the effects of Ms. Ratliff's pain, fatigue, and treatment in the RFC.

Rather than specifically identifying evidence that she asserts the ALJ misconstrued or failed to consider in assessing her RFC, Ms. Ratliff: (1) cites to several records which she contends showed her pain, fatigue, malaise, social isolation, and limited activities of daily living; (2) notes that she often attended several medical appointments per week, and cites to records for one hospitalization; and (3) notes her complaints of frequent migraines.  (ECF Doc. 10, p. 14.)

As to Ms. Ratliff's various allegations of pain, fatigue, and limited activities of daily living, the Court finds that the ALJ adequately addressed those allegations in his RFC analysis. The specific records cited in Ms. Ratliff's brief do not change this analysis.  Two records pertain

to the treatment of migraine headaches before the January 2017 application date (*see* Tr. 416, 421), and the ALJ adequately acknowledged her migraine headaches.  Two records pertain to the same December 3, 2020 office visit with a neuromuscular specialist that the ALJ discussed in his own analysis.  (*See* Tr. 1407, 1781, 1873.)  And two records pertain to therapy visits where Ms. Ratliff complained of pain and other symptoms relating to her physical and mental health (Tr. 1876, 1880), which the ALJ adequately addressed in his analysis of her symptoms (Tr. 1406-10)

As to her arguments regarding frequent medical appointments and one hospitalization, the Court finds Ms. Ratliff has not met her burden to show that the ALJ lacked substantial evidence to support the RFC.  She does not cite to specific records showing the frequency of her medical visits, nor does she demonstrate that the timing and frequency of such visits would necessarily require additional allowances for absenteeism or otherwise preclude her from engaging in full-time work.  With respect to the hospitalization to remove a cancerous growth (Tr. 1626-41), it is also noted that the record does not suggest significant ongoing treatment for that condition (Tr. 1815 (January 2021 record noting Ms. Ratliff was two years out from her original thyroid cancer diagnosis and doing well with no evidence of disease recurrence)).  Ms. Ratliff has thus failed to show that the ALJ lacked substantial evidence to support his finding that she can perform full-time work subject to the limitations set forth in the RFC.

As to her allegations of frequent migraines, the Commissioner argues "it is notable that, outside of a brain MRI back in 2017 (Tr. 585), the record does not reflect any ongoing treatment for headaches."  (ECF Doc. 12, p. 16.)  This argument is consistent with the records cited by Ms. Ratliff in support of her argument, which include two treatment visits for migraines in November and December of 2016, prior to the application date (Tr. 416, 421), her testimony regarding migraines at the February 2019 hearing (Tr. 119), and a "ROS as per Epic" (report of symptoms)

peripherally noting her complaints of migraines at a December 2020 office visit with a neuromuscular specialist regarding her concern for neuropathy (Tr. 1781).  As noted above, the ALJ found her migraine headaches constituted a severe impairment (Tr. 1397), considered her subjective symptom allegations and found they were not entirely consistent with the record as a whole (Tr. 1406-07), and explicitly factored in Ms. Ratliff's reported migraines when assessing the RFC (Tr. 1411).  Ms. Ratliff has failed to demonstrate that the ALJ erred in his consideration of her migraine headaches when assessing the RFC.

For the reasons set forth above, the Court finds that Ms. Ratliff has not met her burden to show that the ALJ lacked substantial evidence to support his RFC assessment.  Accordingly, the Court finds Ms. Ratliff's third assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

October 11, 2024

/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge